**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICK GERARD CARSON, *UNITED* *STATES OF AMERICA EX REL.,* STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF RHODE ISLAND, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA and STATE OF WASHINGTON** | : : : : : : : : : : : : : : : : : : | |
| **v.** | : : | |
| **SELECT REHABILITATION, INC., BRYN MAWR TERRACE, SAUNDERS HOUSE, MAIN LINE SENIOR CARE ALLIANCE, CARE PAVILION NURSING AND REHABILITATION CENTER, MID-ATLANTIC HEALTHCARE, LLC, WESLEY ENHANCED LIVING MAIN LINE REHABILITATION & SKILLED NURSING, WESLEY ENHANCED LIVING and MARWOOD REST HOME, INC.** | : : : : : : : : : : : : | **CIVIL ACTION NO. 15-5708** |

**MEMORANDUM OPINION**

Savage, J.                                                    August 18, 2023

In this *qui tam* action alleging Medicare fraud, the dispositive issue is whether it is barred by the public disclosure provision of the False Claims Act, 31 U.S.C. § 3730(e)(4)(A) ("FCA").  We must determine whether the Complaint alleges facts that are substantially the same as those disclosed in news articles and government reports published before the lawsuit was filed and add nothing material to them.

After reviewing the Complaint together with the articles and reports, we conclude that the public disclosure bar does not preclude the Relator's action because he provides independently gathered information that materially adds to the news articles and the reports the defendants contend were his source.  He is also an original source of the information.

Relator Patrick Gerard Carson brought this action against Select Rehabilitation, Inc. ("Select"), a contract provider of rehabilitative services for whom he worked, and eight skilled nursing facilities—Bryn Mawr Terrace ("BMT"), Saunders House ("Saunders"), Main Line Senior Care Alliance ("Main Line"), Care Pavilion Nursing and Rehabilitation Center ("Care Pavilion"), Mid-Atlantic Healthcare, LLC ("Mid-Atlantic"), Wesley Enhanced Living Main Line Rehabilitation & Skilled Nursing ("Wesley Rehab"), Wesley Enhanced Living ("Wesley"), and Marwood Rest Home, Inc. ("Marwood") (at times we refer to the skilled nursing facility defendants as the "SNFs").[1]

The gist of Carson's action is that Select orchestrated a scheme to submit false and fraudulent claims to Medicare and Medicaid designed to maximize the reimbursement rates for therapy.  The defendants billed for time for therapy that was not provided, time spent with patients performing nonskilled activities as skilled therapy and time for therapy that was medically unreasonable, unnecessary, and harmful to patients.

Select provides rehabilitative services to patients at skilled nursing facilities ("SNFs") throughout the United States.  It staffs SNFs with physical therapists, therapist assistants, occupational therapists, and certified occupational therapist assistants.  Two of those SNFs were Care Pavilion and Wesley Rehab.  Care Pavilion is owned by Mid-Atlantic, and Wesley Rehab is owned by Wesley.

Carson, a physical therapy assistant formerly employed by Select, filed this action under seal on October 20, 2015.  He alleges violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A)–(G) and 3730(h), and fifteen state false claims laws.[2]

On July 5, 2022, the United States declined to intervene as to eight of the nine defendants and intervened as to Saunders for settlement purposes.[3]  The United States and Carson stipulated to the dismissal of the claims against Saunders, BMT, and Main Line.[4]  Carson continues to pursue claims against the remaining six defendants.

Select, Mid-Atlantic, and Wesley, in addition to raising the public disclosure bar, move to dismiss pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).  They contend that Carson fails to plead violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) with the requisite plausibility and particularity required by Rules 8(a) and 9(b).  They argue that he fails to allege the who, where, when, and how of the claims, and he impermissibly lumps the defendants together.  They add that the state false claims causes of action fail for the same reasons.  They contend the conspiracy claim under 31 U.S.C. § 3729(a)(1)(C) fails because he does not identify the conspirators, an agreement to violate the FCA, or an underlying violation of the FCA.  Defendants also argue that Carson fails to state a claim for violations of 31 U.S.C. §§ 3729(a)(1)(D)–(F) because the Complaint is devoid of any facts to support these causes of action.  Next, they assert that Carson fails to plead a reverse false claim under 31 U.S.C. § 3729(a)(1)(G) because he did not allege the existence of a clear obligation or liability to the government.

Select argues that Carson cannot state a retaliation cause of action under 31 U.S.C. § 3729(a)(1)(H) because he did not plead facts which, if proven, would show he engaged in protected conduct or that there was a connection between his complaints and

his termination. The SNF defendants contend that they did not employ or terminate Carson, so they could not have retaliated against him.

We shall grant the motions to the extent they seek dismissal of Counts I through XIII against Care Pavilion, Mid-Atlantic, Wesley Rehab, Wesley, and Marwood,[5] and dismissal of Counts III through VII and IX through XIII against Select.  We shall deny the motions to the extent they seek dismissal of Counts I, II and VIII against Select.

## Background

### The Medicare Reimbursement System

Beneficiaries are eligible under Part A Medicare for care at a SNF after a minimum three-day covered stay in an acute care hospital.[6]  Part A covers SNF services for up to 100 days per "spell of illness."[7]  Medicare Part B covers therapy services for SNF patients who have exhausted their Part A benefits or did not have a qualifying hospital stay.[8]

Patients at SNFs are eligible for nursing care or physical, occupational and speech therapy ordered by a physician.[9]  Therapy must be reasonable, necessary, specific, and effective for the patient's condition.[10]  The following conditions must be met:

- The therapy level's complexity and sophistication, or the patient's condition, require the skills of a qualified therapist rather than non-skilled SNF staff;

- The medical record contains an active treatment plan that includes specific and measurable treatment goals related to the patient's condition along with a reasonable time estimate of when those goals will be achieved;

- The treatment plan describes the specific therapeutic interventions to restore the patient's level of function lost or reduced by illness or injury;

- The amount, frequency, and duration of therapy must be reasonable and necessary for the patient's condition;

- Therapy is provided either by or under the direct supervision of a licensed therapist; and

- Therapy must be provided with the expectation, based on the assessment made by the physician or therapist of the patient's restoration potential that the patient's condition will improve substantially in a reasonable and generally predictable period of time, or the therapy must be necessary for the establishment of a safe and effective maintenance program.[11]

SNFs use an assessment tool known as the Minimum Data Set ("MDS")[12] to assess a patient's clinical condition, functional status, and expected use of services.[13] Based on this assessment, the SNF classifies patients into resource utilization groups ("RUGs").[14] Each RUG classification has a different reimbursement rate. There are eight RUG categories.[15] Two are "Rehabilitation" and "Rehabilitation Plus Extensive Services."[16] These "Therapy RUGs" are for beneficiaries who need physical, speech, or occupational therapy.[17] The other six categories, known as "nontherapy RUGs," are for patients who require little to no therapy.[18]

The different RUG classifications each has a different *per diem* payment rate.[19] Medicare pays more for therapy RUGs than nontherapy RUGs.[20] Therapy RUGs are divided into five therapy levels: ultrahigh, very high, high, medium, and low.[21] Medicare pays the most for ultrahigh therapy and the least for low.[22] According to Carson, in order to maximize reimbursement rates, Select purposely assigned patients to the higher RUGs, whether they needed it or not.[23]

## Relator's Complaint

Carson alleges a fraudulent scheme to defraud the government. In describing how the scheme worked, he portrays the relationships among the defendants, the manner in which they manipulated the therapy regimes to generate inflated bills, and how they submitted false bills to Medicare and Medicaid.

Select contracts with SNFs to provide rehabilitative services to patients throughout the United States.[24] It touts itself as "one of the largest providers of contract rehabilitation

services" and has "the clinical and financial expertise required for the . . . management and delivery of therapy services in today's . . . ever-changing [Medicare and Medicaid] regulatory environment."[25]   According to Select's website, it "maximizes . . . financial outcomes" through an "intense focus [that] ensures that no stone is left unturned, no RUG level is missed."[26]

Select had contracts with Care Pavilion[27] and Wesley Rehab to provide rehabilitation services.[28]   Care Pavilion "has 396 beds and can accommodate up to 387 residents."[29]   It is managed by Mid-Atlantic.[30]   Wesley Rehab is "an assisted-living community" that offers residents "personal care services as well as rehabilitation and skilled nursing care."[31]   It is managed by Wesley.[32]

Carson was employed by Select from October 28, 2011 to March 2015 as a physical therapist assistant.[33]   He worked at Care Pavilion and Wesley Rehab where Select provided therapy services.[34]

During his employment with Select, Carson discovered the fraudulent scheme.  As described in his Complaint, the scheme worked as follows. Select supplied physical therapists, therapist assistants, occupational therapists, and certified occupational therapist assistants.[35]   Select manipulated therapy practices and billed for services that were not provided, were inaccurate, and were medically unnecessary.[36]   Care Pavilion and Wesley Rehab submitted these false and fraudulent bills to Medicare and Medicaid for reimbursement.[37]

Select management pressured staff to "capture the highest number of treatment minutes,"[38] "bill for all scheduled therapy hours"[39] whether provided or not, and maintain "unrealistic"[40] and "high productivity levels."[41]   Staff were expected to achieve productivity

levels above 90%.[42]  This required recording more than 90% of the day on billable skilled therapy services—a goal that was unattainable given the time necessarily spent on nonbillable tasks.[43]

Defendants had "a corporate policy of retaining patients based on billing potential rather than patient well-being."[44]  Staff could not discharge patients without corporate approval.[45]  Defendants delayed discharging patients for days, even weeks, to maximize reimbursements without regard to medical necessity.[46]  Patients were not discharged on Fridays because management wanted to fill beds over the weekend when the patient population was usually at its lowest.[47]  Management refused to discharge patients under the pretext that "no one would be home with them" even though they did not need anyone to assist them.[48]

At management's direction, billable therapy hours were inflated in anticipation of holidays, missed workdays, or poor weather.[49]  For example, at a team meeting on March 28, 2013, management increased the amount of therapy minutes scheduled for all patients ahead of the Easter holiday to ensure that staff made up for the minutes that they would lose due to the holiday.[50]  Defendants also instructed staff to increase therapies when billing was low.  For example, at a July 24, 2013 staff meeting, the Director of Rehabilitation instructed staff to increase patient therapy minutes because "minutes were down at Saunders House."[51]

Carson alleges that defendants "systematically engaged in a practice of billing for treatments that were to be delivered in the future."[52]  Carson explains:

> Directors of Rehabilitation would inform the staff to treat a patient for a proscribed [sic] period of time.  If all the minutes could not be captured during that proscribed [sic] time, the therapists were to bill the minutes any way and *come back at*

*an unspecified time in the future*.  However, no further such treatment was ever rendered to the patient and management knew of this fact.[53]

In sum, corporate policies were aimed at billing as much as possible at the highest rate possible for as long as possible—whether or not patients needed or received the treatment.

Carson describes how these policies were implemented.  Management established a patient's plan of care based on the patient census at the facility, not on the patient's condition.[54]  Management divided treatment minutes based on the number of patients at the SNF.[55]  The greater the number of patients, the lower the treatment minutes assigned to each patient; the lower number of patients, the higher number of treatment minutes ordered.[56]

After determining treatment minutes, Directors of Rehabilitation dictated the length of treatment.[57]  Specifically, management began each day by providing a list setting the amount of treatment minutes each patient was to receive that day.[58]  Therapists were expected to bill according to the scheduled minutes, even when the therapy was not provided.[59]  At the end of the day, staff entered the number of scheduled therapy minutes each patient received into the data management system.[60]  The "Select Rehabilitation Area Manager would alter therapists' time records by adding billed hours without the knowledge of the treating therapist."[61]  The SNFs then submitted these false and fraudulent bills to Medicare and Medicaid for payment.[62]

Carson engaged in manipulating therapy and billing practices.  Many of the patient examples appear to be patients he treated.  According to Carson, defendants "made" him inflate the minutes he billed to Medicare and Medicaid.[63]  There were times when

management told him that "he was not 'productive' enough – meaning that he was not engaging in the improper schemes."[64]  Because he "could not afford to lose his job[,] . . . he did what his employer and supervisors told him to do."[65]

Carson eventually had enough.[66]  He complained to his supervisors about the improper conduct and refused to overbill.[67]  His repeated complaints about improper billing practices led to Select terminating his employment on March 9, 2015.[68]

## Analysis

### Public Disclosure Bar[69]

Section 3730(e)(4)(A), known as the public disclosure bar, provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media.
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A)(i)–(iii).

We first ask whether the "information was publicly disclosed via one of the sources listed in § 3730(e)(4)(A)." *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 235 (3d Cir. 2013) (quoting *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 U.S. F.3d 506, 519 (3d Cir. 2007)).  If it was, we then ask whether it disclosed information alleging fraud.

Carson filed his Complaint on October 20, 2015, two months after a news article describing skilled nursing facilities overbilling Medicare for unreasonable or unnecessary therapy was published in the Wall Street Journal.  Arguing that Carson's allegations are "substantially" the same as those disclosed in the Wall Street Journal article and add nothing material to them, Select, Mid-Atlantic, and Care Pavilion contend the lawsuit is barred by the public disclosure provision of 31 U.S.C. § 3730(e)(4)(A).

Carson counters that the Wall Street Journal article does not disclose a fraudulent transaction and does not name the defendants.  It merely describes generally a suspected problem in the SNF industry.  Carson contends he is an original source of the information underlying his allegations.  He maintains that the public disclosure bar does not apply because his allegations are independent of and materially add to the facts in the article.  Finally, he argues that he had disclosed his allegations to the government before the Wall Street Journal Article was published.  His attorney had submitted a confidential pre-suit Disclosure Statement with exhibits to the United States Attorney's Office for the Eastern District of Pennsylvania on August 7, 2015, six days before the Wall Street Journal article was published.[70]  In the declaration attached to his response to the motion to dismiss, his attorney represented that the allegations in the Disclosure Statement were the same as those in the Complaint filed on October 20, 2015.

In reply to Carson's response that the article was published after his disclosure to the government, Select attached four government reports and nine news articles it contends are public disclosures published before Carson brought his allegations to the government's attention.  They were published between 2009 and May 2015.  All were published before the Wall Street Journal article appeared on August 16, 2015.[71]

<u>Government Reports</u>

There are four government reports Select contends bar Carson's Complaint under Section 3730(e)(4(A)(ii).  Two are reports released by the Department of Health and Human Services Office of Inspector General ("OIG").  "Questionable Billing by Skilled Nursing Facilities" was released in December 2010.[72]  "Inappropriate Payments to Skilled Nursing Facilities Cost Medicare More Than a Billion Dollars in 2009" was issued in November 2012.[73]

The goal of the December 2010 OIG study was to determine and identify (1) "the extent to which billing by skilled nursing facilities (SNF) changed from 2006 to 2008"; (2) "the extent to which billing varied by type of SNF ownership in 2008"; and (3) "SNFs that had questionable billing in 2008."[74]  It found that "[f]rom 2006 to 2008, SNFs increasingly billed for higher paying RUGs, even though beneficiary characteristics remained largely unchanged."[75]  Specifically, RUGs for ultrahigh therapy increased from 17% to 28%, even though patients' ages and diagnoses at admission did not change.[76]

The study reported that "[f]or-profit SNFs were far more likely than nonprofit or government SNFs to bill for higher paying RUGs."[77]  For-profit SNFs billed for ultrahigh therapy RUGs 32% of the time, as compared to 18% for nonprofit SNFs and 13% for government SNFs.[78]  They had longer average lengths of patient stays.[79]  For-profit SNFs owned by large chains were the most likely to bill for higher paying RUGs.[80]

Finally, it found that "[a] number of SNFs had questionable billing in 2008."[81]  Questionable billing practices included billing more frequently for higher paying RUGs and having patients stay for unusually long amounts of time.[82]  These practices "indicate that certain SNFs may be routinely placing beneficiaries into higher paying RUGs regardless of the beneficiaries' care and resource needs or keeping beneficiaries in Part

A stays longer than necessary."[83]   These findings were included in a separate memorandum that was not attached to the report.[84]   The parties did not include it in the filings.

In light of these findings, the December 2010 OIG study made four recommendations.   First, CMS should "[m]onitor overall payments to SNFs and adjust rates, if necessary."[85]  Second, CMS should "[c]hange the current method for determining how much therapy is needed to ensure appropriate payments."[86]   Third, CMS should "[s]trengthen monitoring of SNFs that are billing for higher paying RUGs."[87]  Finally, CMS should "[f]ollow up on the SNFs identified as having questionable billing."[88]

The November 2012 study was performed because, in recent years, the OIG had identified billing problems with SNFs.[89]   These problems included "the submission of inaccurate, medically unnecessary, and fraudulent claims."[90]   The study conducted a medical record review of a random sample of SNF claims from 2009.[91]  It found that:

> SNFs billed one-quarter of all claims in error[92] in 2009, resulting in $1.5 billion in inappropriate Medicare payments. The majority of the claims in error were upcoded; many of these claims were for ultrahigh therapy. The remaining claims in error were downcoded or did not meet Medicare coverage requirements. In addition, SNFs misreported information on the [Minimum Data Set] for 47 percent of claims. SNFs commonly misreported therapy, which largely determines the RUG and the amount that Medicare pays the SNF.[93]

Based on these findings, the November 2012 study made six recommendations to CMS.  They were:

> (1) increase and expand reviews of SNF claims, (2) use its Fraud Prevention System to identify SNFs that are billing for higher paying RUGs, (3) monitor compliance with new therapy assessments, (4) change the current method for determining how much therapy is needed to ensure appropriate payments,

(5) improve the accuracy of MDS items, and (6) follow up on the SNFs that billed in error.[94]

The study blamed SNFs for upcoding to increase Medicare payments. Although the November 2012 study discussed SNF overbilling, there was no suggestion that therapy providers were involved in SNF billing.

Select attached two other government reports to its reply.  One was a July 2011 memorandum report to Donald M. Berwick, M.D., Administrator for Centers for Medicare & Medicaid Services from Stuart Wright, Deputy Inspector General for Evaluation and Inspections, with the subject line "Early Alert Memorandum Report: *Changes in Skilled Nursing Facilities Billing in Fiscal Year 2011*."[95]  This memorandum "describes the extent to which billing by SNFs changed from the last half of FY 2010 to the first half of FY 2011."[96]  It found that "Medicare payments increased by $2.1 billion, or 16 percent, from the last half of FY 2010 to the first half of FY 2011" and that "in the first half of FY 2011, SNFs billed for higher levels of therapy and for very little concurrent therapy."[97]  It also found that "[b]etween the last half of FY 2010 and the first half of FY 2011, billing decreased slightly for therapy overall. Billing for extensive services and for high levels of assistance with ADLs also decreased."[98]  There is no accusation of fraud.

The other report was the Department of Health and Human Services Office of Inspector General's Semiannual Report to Congress, for the period October 1, 2010 to March 31, 2011, that discussed, in part, questionable billing practices by SNFs.[99]  It discusses how "[f]rom 2006 to 2008, . . . [SNFs] increasingly billed for higher-paying resource utilization groups, even though beneficiary characteristics remained largely unchanged."[100]  The review of this practice "raised concerns about the potentially

inappropriate use of higher-paying resource utilization groups, particularly those for ultra-high therapy."[101]

News Articles

Select cites ten articles it contends bar Carson's Complaint under Section 3730(e)(4(A)(iii).   Six of the articles discuss the December 2010 OIG report.   Three discuss the November 2012 report.   The articles are summarized below.

1.   The August 16, 2015 Wall Street Journal article, titled "How Medicare Rewards Copious Nursing-Home Therapy," described how payment rules adopted by Medicare in 1998 enabled SNFs to maximize reimbursements by providing patients with clinically unnecessary therapy services.[102]  It explained how the Medicare reimbursement system rewards high intensity care.[103]  As a result, SNFs bill for higher therapy levels as much as possible.[104]  An increasing number of patients are given ultrahigh therapy—the allowable maximum of 720 minutes of therapy per week—regardless of medical need.[105] It explained how SNFs manipulated the process and demanded employees prescribe and provide unnecessary therapy.[106]  The article identifies several owners of SNFs which significantly increased billing for ultrahigh therapy between 2002 and 2013.[107]  For example, Genesis Healthcare Corp. billed for ultrahigh therapy in 58% of days in 2013, up from 8.1% in 2002.[108]  A similar trend was seen at SNFs owned by Kindred Healthcare Inc., HRC, and Five Star Quality Care Inc.[109]  Although the article exposed the billing practices of SNFs, it only identifies one contractor, Kindred Healthcare Inc., providing rehabilitation services at SNF facilities.[110]  Select is not mentioned.  Nor are the other defendants.

2.   A May 2015 article, "DOJ Pursuing Therapy Providers Under the FCA" published in Health Care Law Today, discussed the Department of Justice's increase in enforcement of the False Claims Act against therapy providers through civil and criminal investigations addressing overbilling and increased therapy minutes.[111]  It listed practices that the DOJ has questioned, including "[p]resumptive placement of patients at maximally-reimbursable reimbursement levels (ultrahigh RUG levels)"; "[b]illing for more minutes than actually provided"; and "[b]illing unskilled services as skilled services."[112]  The DOJ contends that these practices, among others, "result in the submission of false claims to the government for reimbursement, resulting in FCA liability and health care fraud."[113] This article also discussed specific cases and recent settlement.[114]  The article discussed the December 2010 and November 2012 OIG reports.[115]

3.   A March 2013 article, published by Reuters Legal with the headline "Government report finds care lapses at nursing facilities," addressed a report published by the Office of Inspector General for the Department of Health and Human Services that "raised concerns that skilled nursing facilities were overbilling Medicare for unnecessary physical therapy."[116]  It also discussed several federal cases, including one that accused

14

an operator of an SNF of "providing worthless wound-care services to residents at two of its Atlanta nursing homes."[117]

4.      A November 2012 legal alert published by Martindale titled "New OIG Report Cites $1.5 Billion in Inappropriate Medicare Payments to Skilled Nursing Facilities."[118]  This alert discussed the November 2012 study by the Department of Health and Human Services – Office of Inspector General, finding that "the majority of the inappropriate claims were upcoded, and many involved claims for so-called 'ultrahigh therapy.'"[119]   This article discussed the December 2010 and November 2012 OIG reports.[120]

5.      A November 2012 article appearing in The Wall Street Journal Online, titled "Nursing Homes Said to Overbill U.S.," discussed how SNFs overcharged Medicare.[121]  It cited upcoding, providing inappropriate treatment, and billing for therapy that was not provided or was unnecessary.[122]  It discussed the November 2012 OIG report.[123]

6.      A January 2012 article published by The National Law Review titled "CMS's Recovery Audit Contractors Appear Poised to Audit Facilities With Ultra High Therapy RUGs."[124]  The article discussed how Recovery Audit Contractors (RACs) in some parts of the U.S. have begun requesting documentation from certain skilled nursing facilities (SNFs), suggesting that the Centers for Medicare and Medicaid Services (CMS) may be ready to unleash the RACs on SNFs with designated levels of High Therapy RUGs utilization.[125]  It refers to the December 2010 OIG report.[126]

7.      A January 2011 NewsRoom and Modern Healthcare article, titled "SNF billing questioned – HHS report draws ire from industry members."[127]   This article discussed how "[m]embers of the skilled-nursing facility industry disagree with a report from the HHS inspector general office that concludes nursing homes likely are coding for Medicare-covered therapy at greater rates of severity than is necessary."[128]  This article discussed the December 2010 OIG report.[129]

8.      A December 2010 article, titled "OIG wants to crack down on nursing home RUG billing," reported that the Office of the Inspector General discovered "that some nursing homes are charging Medicare more then they should for" RUGs, and discussed the Office of the Inspector General's findings.[130]   This article discussed the December 2010 OIG report.[131]

9.      A December 2010 article, published by RACmonitor and titled "Questionable Skilled Nursing Billings Could Top $500 Million," called attention to the December 2010 study by the Department of Health and Human Services – Office of Inspector General titled "Questionable Billing by Skilled Nursing Facilities."[132]  The article discusses the report's findings and recommendations.  It also discussed the Office of Inspector General's recommendations to CMS that CMS agreed to implement: "One, going forward CMS likely will adjust RUG rates annually, if necessary, to ensure that changes to the payment groups do not significantly affect payments.[133] Two, CMS agreed to instruct its contractors to strengthen monitoring of SNFs that are billing for higher-

paying RUGs, in part by developing thresholds for certain indicators and conducting additional reviews of SNFs that exceed them.[134]   And three, CMS will be targeting the SNFs cited by the OIG for questionable billing in its report."[135]   CMS did not agree to implement a fourth recommendation—changing "the current method for determining how much therapy is needed in order to ensure appropriate payments."[136]   This article discussed the December 2010 OIG report.[137]

10.    A March 2010 Washington Post article, under the headline "Review heightens concerns over Medicare billing at nursing homes," analyzed trends in SNFs' abuse of the Medicare payment rules and how they are overbilling Medicare for services that they are not providing.[138]

These news articles fall within the news media category of a public disclosure under § 3730(e)(4)(A)(iii).  There is no question that the government reports fall into the category of "congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation."  31 U.S.C. § 3730(e)(4)(A)(ii).

Having concluded that the news articles and government reports qualify as sources listed in Section 3730(e)(4)(A), we now determine whether the articles and the studies or reports publicly disclosed information amounting to allegations or transactions of fraud.  *Zizic*, 728 F.3d at 235.

There must be "an explicit accusation of wrongdoing" to qualify the articles or reports as public disclosures under Section 3730(e)(4)(A)(i)–(iii).  *Id.* at 235–36 (citing *United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 741 (3d Cir. 1997)). "A transaction warranting an inference of fraud is one that is composed of a misrepresented state of facts plus the actual state of facts."  *Id.* at 236 (citing *Dunleavy*, 123 F.3d at 741).  In other words, we compare the false statements (the therapy billed) and the true statements (the therapy actually delivered).  Does the comparison give rise to an inference of fraud?

The Wall Street Journal article was published after Carson's attorney submitted a confidential pre-suit Disclosure Statement with exhibits on Carson's behalf to the United States Attorney's Office for the Eastern District of Pennsylvania. Defendants conceded this at oral argument. The remaining articles and reports predated Carson's notice to the government.

The defendants argue that the news articles and government reports publicly disclosed fraudulent transactions. Carson disagrees. He acknowledges that his allegations are similar to the reports and news articles. But, the reports and articles do not identify the defendants in this case. They only describe generally an industry problem.

The news articles and the government reports publicly disclosed suspicious billing practices and fraudulent billing. Some of them raise concerns of SNFs overbilling for undelivered or unnecessary therapy. Others state that some SNFs have submitted fraudulent claims. For example, the November 2012 OIG report stated: "In recent years, the Office of Inspector General has identified a number of problems with billing by skilled nursing facilities (SNF), including the submission of inaccurate, medically unnecessary, and fraudulent claims."[139] It also reported that "one SNF reached a settlement agreement on allegations of fraudulent billing for medically unnecessary therapy."[140] This appears to be an example of how the billing regime allows other SNFs to engage in fraudulent billing for unnecessary therapy. It does not implicate therapy providers in the transactions.

Having determined that the news articles and government reports publicly disclosed fraudulent transactions, we ask whether Carson's claims are based on those public disclosures. *Zizic*, 728 F.3d at 237 (quoting *Atkinson*, 473 F.3d at 519). If Carson's

claims are "'supported by' or 'substantially similar to' public disclosures," his action must be dismissed unless he is an original source.  *Id.* (quoting *United States ex rel. Mistick PBT v. Hous. Auth. of the City of Pittsburgh*, 186 F.3d 376, 385–88 (3d Cir. 1999)).

Defendants contend that Carson's allegations are substantially similar to the revelations in the news reports and articles.  According to them, Carson is simply "extrapolating from or expanding on the allegation to include the allegedly new fraudsters."[141]  They add that identifying a new fraudster is not enough because the Wall Street Journal article reported "on a phenomenon in the SNF 'industry in general.'"[142]

To support its argument, Select cites *United States ex rel. Zizic v. Q2Adminstrators, LLC*, 728 F.3d 228 (3d Cir. 2013) and *United States v. Omnicare, Inc.*, 903 F.3d 78 (3d Cir. 2018).  These cases are distinguishable.

In *Zizic*, two companies served as qualified independent contractors ("QICs") for the Department of Health and Human Services ("HHS") reviewing benefit claim denials related to durable medical equipment ("DME").  728 F.3d at 231–33.  Only one QIC company contracted with HHS at a time.  *Id.* at 233, 238.   Relator, the former President and CEO of a DME company that had many claims denied by the QICs as medically unreasonable and unnecessary, alleged that the two companies fraudulently billed Medicare for reviewing benefit claim denials they did not review.  *Id.* at 233–34.  A prior lawsuit publicly disclosed that the fraud was taking place in the QIC industry, but did not identify the two companies.  *Id.*  The issue was whether the complaint was based on the public disclosure in the prior lawsuit.  *Id.*

The Third Circuit found that even though the two companies were not identified in the prior lawsuit, "they were directly identifiable from that public disclosure" because "the

QIC industry is an industry of one" and the identities of the QICs were publicly available on the HHS website.  *Id.* at 238.  In other words, the two companies were the only ones in the QIC universe and only one QIC company contracted with HHS at a time.  Because the two companies were easily identifiable from the public disclosure, the Third Circuit held that the relator's claims "were based on the publicly disclosed fraudulent transaction" in the prior litigation.  *Id.*

In *Zizic*, unlike in this case, there were only two identifiable actors engaged in the alleged fraud.  The SNF industry has many players.  There are SNFs, companies that own the SNFs, and companies that contract with SNFs to provide rehabilitative services.  Not all of them are implicated in fraud.  Identifying which ones are is not apparent from the reports and articles.

In *Omnicare*, a long-term care pharmacy was accused of a swapping scheme.  903 F.3d at 81.  Swapping is the practice of offering nursing homes below market prices for drugs for patients insured by Medicare Part A in exchange for referrals of prescriptions for nursing home patients insured by Medicare Part D or by Medicaid.  *Id.* at 82.  The incentive to swap arises from the payment structure for Medicare Part A and Part D patients.  *Id.* at 81. For Medicare Part A patients, SNFs are reimbursed a fixed *per diem* rate directly by the government.  *Id.* at 82.  Nursing homes use the fixed amount to pay for all of a patient's care, including prescription drugs.  *Id.*  For Medicare Part D and Medicaid patients, pharmacies are reimbursed directly by the government on a cost basis.  *Id.*  Prescription drug costs are not included in the *per diem*.  This payment structure incentivizes "nursing homes to 'swap' with the pharmacies for lower drug prices for Part A patients in return for allowing the pharmacy to serve the more lucrative Part D patients."

*Id.*  It also incentivizes pharmacies because "it could be in their interest to provide drugs to Part A patients at even below-cost prices because there are many fewer Part A patients than Part D patients, and the profit margins on the services provided to the Part D patients that the pharmacies would win the right to serve could compensate for the losses incurred by serving the Part A patients."  *Id.*

The *Omnicare* relator, a former nursing home and pharmacy owner, alleged the long-term care pharmacy defrauded the government by billing Medicare and Medicaid for claims it certified complied with the Anti-Kickback Statute.  *Id.*  Government reports[143] identified the general risk of swapping in the nursing home industry.  *Id.* at 85–86.  The *Omnicare* defendant contended that the complaint rested on the public disclosures in those documents.  *Id.* at 86.  The district court agreed and dismissed the action.

The Third Circuit reversed, reasoning that "[n]either of the documents, alone or considered together with the rest of the public documents, disclose the fraudulent transactions that [relator] alleges, not least of which because the documents do not point to any specific fraudulent transactions directly attributable to" the long-term care pharmacy.  *Id.* at 86.  Explaining that "the documents merely indicate the possibility that such a fraud could be perpetrated in the nursing home industry" and that relator's "more concrete claim . . . relied upon these general disclosures but could not have been derived from them absent [his] addition of the non-public per-diem information," the Third Circuit held that "the FCA's public disclosure bar is not implicated . . . where a relator's non-public information permits an inference of fraud that could not have been supported by the public disclosures alone."  *Id.*

Here, the news articles and government reports fall short of accusing any particular SNF of fraud.  Rather, they expose questionable billing practices in the SNF industry and mention that some unidentified or unrelated SNFs have submitted fraudulent claims. Although some identify SNFs that provided unusual ultrahigh levels of therapy and possibly have engaged in suspicious billing practices, they do not implicate therapy providers in the billing.  Nor do they identify Select as a contractor providing rehabilitation services.  Without specific accusations against the SNFs named in this case and the therapy providers, the articles and reports fall short of asserting that they engaged in fraud.

Without Carson's non-public information regarding Select, a contractor providing rehabilitative services to SNFs throughout the United States, one could not infer from the article that Select, Mid-Atlantic, and Care Pavilion engaged in the billing practices identified in the news articles and reports.  The publications did not accuse any SNF or rehabilitative services provider in this case of wrongdoing.  Thus, we conclude that Carson's claims were not based on the public disclosures in the news articles or the government reports.

<u>Original Source Exception</u>

Even if Carson's claims were substantially similar to the public disclosures in the news articles and reports, he can still overcome the public disclosure bar.  If he was an original source of the allegations contained in his Complaint, the public disclosure bar does not preclude his FCA claims.  *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 304 (3d Cir. 2016); *United States ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 845 (3d Cir. 2014).

An "original source" is defined in the statute:

> an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or ([ii]) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B)

An original source is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action . . . which is based on the information." *Schumann*, 769 F.3d at 841 (citation omitted); *see also* 31 U.S.C. § 3730(e)(4)(B).

"'Direct knowledge' is knowledge obtained without any 'intervening agency, instrumentality, or influence: immediate.'" *Schumann*, 769 F.3d at 845 (quoting *Atkinson*, 473 F.3d at 520). It is "first-hand, seen with the relator's own eyes, unmediated by anything but [the relator's] own labor, and by the relator's own efforts, and not by the labors of others, and . . . not derivative of the information of others." *Id.* (quoting *United States ex rel. Paranich v. Sorgnard,* 396 F.3d 326, 336 & n.11 (3d Cir. 2005)).

"The independent knowledge requirement means that 'knowledge of the fraud cannot be merely dependent on a public disclosure.'" *Id.* (quoting *Paranich,* 396 F.3d at 336). In other words, "a relator who would not have learned of the information absent public disclosure [does] not have 'independent' information" under the FCA. *Id.* (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1160 (3d Cir. 1991)).

As noted, the news articles and government reports revealed questionable and unusual billing practices of SNFs.  Defendants are not identified in any of the articles or reports.  More importantly, the articles and reports did not accuse any SNF or therapy provider in this case of wrongdoing.  Nor did they identify any fraudulent billing scheme involving the participation of both SNFs and therapy providers.  None of them described how the billing scheme worked.  Carson does.

Select argues that tax forms, Form 990s, disclose that Select provided therapy and rehabilitative services to BMT, CarePavillion and Saunders House.[144]  Select contends these tax filings qualify as federal reports under § 3530(e)(4)(A)(ii).  Assuming they do, they, alone or together with the news articles, do not connect Select to the overbilling scheme.  They merely show Select provided therapy services to certain SNFs.  There is no evidence of overbilling in the tax forms.

The link implicating the defendants was provided by Carson.  The news articles and the reports suggested unusual or suspiciously high levels of therapy services.  They did not detail actual fraudulent billing.  Unlike the news articles and the reports, Carson supplied material facts revealing the defendants' participation in a fraudulent scheme and how the scheme worked.  He alleges that the defendants employed or contracted therapists and assistants who, at the direction of the defendants, overbilled for therapy services, billed for therapy services that were not provided or only partially provided, billed nonskilled activities as skilled therapy, and billed for unreasonable, unnecessary and harmful therapies.  At defendants' direction, the therapists and therapy assistants shifted treatment minutes among the three therapy disciplines, manipulated the use of concurrent therapy and the amount of therapy provided to privately insured patients, overused

modalities like electric stimulation and ultrasound, billed improperly for treatment, billed for services not provided, and delayed patient discharge.  He provides many patient examples in his Complaint to demonstrate how the scheme worked.

Carson's information, based on his independent first-hand knowledge, confirmed the suspicions raised in the articles and the reports.  His information is independent of and materially adds to the revelations in the news articles and the reports.  Therefore, we conclude that Carson is an original source and the public disclosure bar does not bar this action.

*False Claims Causes of Action*

Having determined that the public disclosure bar does not bar this action, we now address the Rule 8(a), 9(b) and 12(b)(6) motions.

<u>Count I & II – 31 U.S.C. §§ 3729(a)(1)(A)–(B) – Traditional False Claims</u>

To state causes of action under sections 3729(a)(1)(A) and (B), the Relator must allege facts showing: (1) the defendant presented a claim for payment to the United States; (2) the claim was false; (3) the defendant knew the claim was false; and (4) the false statement was material to the payment decision.  *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (citation omitted); *United States ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).  Stated differently, a traditional false claim cause of action "includes four elements: falsity, causation, knowledge, and materiality." *Petratos*, 855 F.3d at 487 (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016)); *see also United States ex rel. Druding v. Care Alternatives*, 952 F.3d 89, 94 (3d Cir. 2020) (citation omitted).

Defendants argue that Carson's first and second causes of action lack the requisite plausibility and particularity of fraud under Federal Rules of Civil Procedure 8(a) and 9(b).

They contend Carson does not allege the who, where, when and how of the alleged fraudulent conduct.  They add that he impermissibly lumps the defendants together, making it impossible to differentiate them.

Rule 8(a) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  The complaint must provide enough information to put the defendant on notice of the claims and to prepare a defense.  *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 326 (3d Cir. 2012) (quoting *Thomas v. Independence Township*, 463 F.3d 285, 295 (3d Cir. 2006)).  Carson's complaint does that.

Contrary to the defendants' argument, the Complaint alleges in detail how the scheme worked and how Select implemented it.  Carson asserts with specificity that management instructed staff to: (1) shift treatment minutes among physical, occupational and speech therapy disciplines, regardless of medical need; (2) manipulate use of concurrent therapy; (3) reduce the amount of therapy provided to privately insured patients; (4) overutilize modalities, such as electric stimulation and ultrasound, and utilize inappropriate modalities; and (5) bill for services not provided.  He described how defendants postponed the discharge of patients for days and sometimes weeks longer than medically appropriate to increase reimbursements from Government-funded health programs.

Carson alleges that these fraudulent billing practices were designed to inflate the time reported by therapy staff delivering therapy services.  The goal was to place patients in the highest possible RUG to receive the highest per diem reimbursement rate from

Medicare and Medicaid, without regard to the necessity and appropriateness of the therapy.

The particularity requirement imposed by Federal Rule of Civil Procedure 9(b) applies in FCA cases. *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n.9 (3d Cir. 2004). Rule 9(b) requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement of Rule 9(b), a complaint must state "the date, place or time of the fraud," or otherwise inject "precision or some measure of substantiation into [the] allegations of fraud." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984)).

As defendants construe the pleading standard, Carson has to prove his case rather than merely plead it. Contrary to their contention, the particularities—the who, where, when and how—of the false claims and the defendants role in them are sufficiently set forth in the Complaint, putting the defendants on notice of what they are accused. The Complaint details how the scheme worked. It shows how the government was billed for unnecessary therapy, therapy that was not provided, and skilled therapy that was not skilled therapy. Carson identifies numerous patient cases detailing how Select inflated time reports used to bill government-funded health plans.

It was not necessary to name every patient. Nor was it necessary to set a precise date of each instance of false billing. Carson alleges when he was employed by Select at the various skilled nursing facilities which contracted with Select. This alerts the defendants to the periods of time, enabling them to identify the management staff and

others who directed therapy staff and oversaw the billing process while Carson was employed there.

These allegations satisfy the Rule 9(b) particularity requirement for his causes of action under § 3729(a)(1)(A) and (a)(1)(B) against Select.  The SNF defendants are another matter.

An essential element of an FCA cause of action is scienter.  Carson must plead facts showing that the defendants acted knowingly, that is, with knowledge that the claims were false.  *Petratos*, 855 F.3d at 487.

Defendants contend that Carson's conclusory allegations of scienter are insufficient.  They argue that he fails to distinguish which defendants, if any, acted with actual knowledge, deliberate ignorance, or reckless disregard to the truth or falsity of the information in the false claims submitted to the government.

"Knowingly" is defined in the FCA to "(A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require[s] no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1)(A)–(B).  It means that defendants "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *United States ex rel. Streck v. Allergan, Inc.* (*Streck I*), 894 F. Supp. 2d 584, 593 (E.D. Pa. 2012) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007)). A defendant's erroneous, but reasonable, interpretation of its legal obligations precludes liability. *United States ex rel. Streck v. Allergan* (the *Streck Appeal*), 746 F. App'x 101, 106 (3d Cir. 2018) (quoting *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–88 (D.C.

Cir. 2015)).  In other words, the defendants must have known that what they were doing was violating the law—submitting false claims.

Carson has alleged facts showing that Select acted with culpable knowledge. Select's management established a patient's plan of care based on the census at the facility, not on the patient's condition or need.  It purposely assigned patients to higher RUGs, whether they needed it or not, to maximize reimbursement rates.  Management determined how many total treatment minutes it wanted to bill in a certain period to maximize reimbursements.  It then divided treatment minutes based on the number of patients at the SNF.  The greater the number of patients, the lower the treatment minutes assigned to each patient.  The lower number of patients, the higher number of treatment minutes were fixed for each patient.  After determining treatment minutes, Directors of Rehabilitation dictated how long to treat a patient.  Specifically, management began each day by providing staff with a list identifying the treatment minutes each patient was to receive that day. Therapists were expected to bill the scheduled minutes of ultrahigh therapy RUGs, even if the therapy was not provided or was not needed.  At the end of the day, Rehabilitation Staff Members entered the number of scheduled therapy minutes each patient received into the data management system. These numbers were often inflated by staff recording longer sessions than actually occurred. Then, the "Select Rehabilitation Area Manager would alter billing sheets by adding hours without the knowledge of the treating therapist."[145]

According to the Complaint, management pressured staff to "capture the highest number of treatment minutes,"[146] "bill for all scheduled therapy hours" even if not provided,[147] and maintain "unrealistic"[148] and "high productivity levels."[149]  Therapy staff

were instructed to shift treatment minutes between the three therapy disciplines, overuse modalities, bill concurrent therapy as several individual therapies, bill as new for inferior and used medical devices, bill nonskilled activities as skilled activities, and provide medically unreasonable and harmful therapy.

These practices were so obviously fraudulent, Select had to have known what it was doing was fraudulent.  These allegations, if proven, would establish the requisite knowledge needed to state a claim under sections 3729(a)(1)(A) and (B) against Select.

Carson's claims against the SNFs do not fare as well.  The SNFs submitted the false bills based on Select's records.  But, there are no facts alleged that they knew the bills were false.  Unlike his particularized allegations about Select's knowing the bills were false, Carson's bald conclusion that the SNFs knew the bills were false is not supported by any facts.  That the SNFs shared in the revenue does not supply the knowledge link. In short, he has not alleged facts to support a conclusion that the SNFs knew the bills were false.

At oral argument, Carson's counsel conceded he could not support that conclusion with facts until he engaged in discovery.  Indeed, he concedes that "[a] lot of it is going to come through discovery."[150]  In the response briefs, he wrote, ". . . the Relator's case, of course, needs to be further developed in discovery, including clarifying the exact roles of the various Defendants in the unlawful scheme the Relator witnessed . . ."[151] Counsel argued that the SNFs knew about the inflated bills "[b]ecause the SNF is actually where the treatment is occurring.  That's were the employees are.  That's the day to day operations."[152]  He argued that "the SNF personnel are not in a vacuum or not involved in what's going on in their facility."[153]

Recognizing the lack of particularity, Carson's counsel stated: "It's there.  It can absolutely be supplied.  A lot of it is going to come through discovery.  We have it."[154]  He also admitted that "Mr. Carson conceded he doesn't have the information."[155]

Carson must do more than speculate to overcome the Rule 12(b)(6) and Rule 9(b) motions.  He must allege facts plausibly demonstrating that the SNFs knew the bills were false.  He has not done so.  Consequently, he has not stated causes of actions against the SNF defendants under sections 3729(a)(1)(A) and (B).

<u>Count III – 31 U.S.C. § 3729(a)(1)(C) – Conspiracy</u>

In Count III, Carson alleges that "Defendant conspired to commit a violation of the FCA."[156]  He also alleges that "[a]s a result of Defendants' conduct," the government incurred damages.[157]  It is unclear to which defendant or defendants he refers.

Select argues that Carson's conspiracy claim in Count III fails because he does not identify any coconspirators, an agreement to violate the FCA, or an underlying violation of the FCA.  It contends that the only agreements alleged—legitimate business contracts between the SNFs and Select for rehabilitation services—are not enough to show the existence of a conspiracy.  Care Pavilion, Mid-Atlantic, Wesley Rehab, and Wesley make the same arguments.

Carson counters that the Complaint alleges an agreement between Select and the other defendants to increase reimbursements from Medicare and Medicaid "by raising the RUGs of the patients receiving care at the SNFs named in the Complaint."[158]  He adds that Select acted in furtherance of this agreement by inflating skilled therapy time reports, misreporting therapy minutes, and providing unnecessary therapy, and the SNFs submitted fraudulent bills to Medicare and Medicaid.

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

A conclusory recitation of the elements of a cause of action is not sufficient.  *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  The plaintiff must allege facts necessary to make out each element.  *Id.* (quoting *Twombly*, 550 U.S. at 563 n.8).  In other words, the complaint must allege facts which support a conclusion that a cause of action can be established.

Section 3729(a)(1)(C) states that "any person who . . . conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(C).  To state a claim under this section, Carson must allege "(1) a conspiracy to get a false or fraudulent claim allowed or paid and (2) an act in furtherance of the conspiracy."  *Atkinson*, 473 F.3d at 514.  There must be an agreement among conspirators to commit a fraud and an act taken in furtherance of the agreement.  Carson must also plead an underlying violation of the FCA.  *See United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 n.53 (3d Cir. 2017) (citing *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014)).  There can

be no agreement to defraud absent the conspirators knowing what they were doing was illegal.

Reading the allegations in the entire Complaint together and drawing all reasonable inferences in Carson's favor, we find that he has not stated a plausible cause of action for conspiracy. In his conspiracy count, Carson incorporates the allegations throughout the Complaint. The Complaint describes how Select knowingly used unlawful methods to maximize reimbursements from Medicare and Medicaid. Specifically, Select inflated skilled therapy time reports, misreported therapy minutes, and provided unnecessary therapy. The SNFs then submitted the fraudulent bills to Medicare and Medicaid. Again, there are no facts alleged that show the SNFs knew the Select records were false, rendering the bills false. Without that knowledge, there could not have been an agreement to defraud the United States.

Carson's Complaint also fails to allege that the SNFs committed an underlying violation of the FCA. He has only stated false claims causes of against Select. The Complaint does not contain facts sufficient to state claims that the SNFs violated sections 3729(a)(1)(A), (B), (D), (E), (F), or (G). Thus, Carson fails to state a cause of action for conspiracy under § 3729(a)(1)(C).

### Count IV – 31 U.S.C. § 3729(a)(1)(D)

Carson claims that the defendants violated § 3729(a)(1)(D), which imposes liability on "any person who . . . has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D). This section prohibits a custodian of government property or money from knowingly withholding or failing to return any portion of it.

Carson has not stated a cause of action under § 3729(a)(1)(D).  He does not allege that any defendant had control of property or money that the Government used or planned to use.  Nor does he allege that the defendants failed to return some or all the property or money.

<u>Count V – 31 U.S.C. § 3729(a)(1)(E)</u>

In Count V, Carson baldly contends that defendants violated § 3729(a)(1)(E), known as the "false receipt" provision.  This rarely invoked provision imposes liability on "any person who . . . is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true."  31 U.S.C. § 3729(a)(1)(E).

Carson's Complaint is devoid of any facts to support a cause of action under § 3729(a)(1)(E) against any defendant.  He does not explain how the defendants violated this section.

<u>Count VI – 31 U.S.C. § 3729(a)(1)(F)</u>

Carson asserts a claim under another rarely used provision, § 3729(a)(1)(F), which imposes liability on "any person who . . . knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property."  31 U.S.C. § 3729(a)(1)(F).

Carson argues that "[c]ontrary to [defendants'] assertions, the Complaint adequately alleges violations of 31 U.S.C. 3279(a)(1)(F)."[159]  That is the extent of his argument.  He points to no facts and no law.  Nowhere in the Complaint does he allege that any of the defendants bought or received public property from anyone in the

government or military.  Nor does he allege that someone in the government or military illegally sold or pledged property to him.

<u>Count VII – 31 U.S.C. § 3729(a)(1)(G)</u>

Carson asserts a claim under § 3729(a)(1)(G), known as a "reverse false claim." To plead a reverse claim, he must allege "that the defendant did not pay back to the government money or property that it was obligated to return." *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 444 (3d Cir. 2004).  There must be a clear obligation of liability to the government.  *Id.* at 445–46.

Carson argues that the defendants "'knowingly . . . avoid[ed] . . . an obligation to pay or transmit money or property to the Government,' by retaining the money improperly obtained through Government reimbursements that resulted from the fraudulent scheme described in particularized detail in the Complaint."[160]   In other words, he alleges that defendants failed to refund the illegally obtained reimbursements that the government paid.

Carson is merely recasting his §§ 3729(a)(1)(A) and (B) false statement claims under § 3729(a)(1)(G).  He cannot do so.  *See, e.g., United States ex rel. Petratos v. Genetech, Inc.*, 141 F. Supp. 3d 311, 322 (D.N.J. 2015), *aff'd* 855 F.3d 481 (3d Cir. 2017) ("Claims raised under the FCA's reverse false claims provision 'may not be redundant of FCA claims asserted under other provisions of [the FCA].'") (citations omitted); *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 280–81 (E.D. Pa. 2020) (dismissing Relators' § 3729(a)(1)(G) claims as "merely recast[ing] their §§ 3729(a)(1)(A) and (B) claims."); *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010) ("He is merely recasting his false statement claim under section 3729(a)(2) . . . [b]ecause

Thomas is using subsection (a)(7) to make a redundant false statement claim under subsection (a)(2) . . . he has not stated a 'reverse false claim' under section 3729(a)(7).").

<u>Count VIII – 31 U.S.C. § 3730(h) - Retaliation</u>

To encourage individuals to expose fraud, the FCA protects employees who participate in investigating and prosecuting FCA violations from retaliation.  *Hutchins v. Wilentz*, 253 F.3d 176, 185–86 (3d Cir. 2001) (citations omitted).  Section 3730(h)(1) of the FCA provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To state a cause of action for retaliation under section 3730(h)(1), Carson must plead facts showing that: (1) Select knew he engaged in protected conduct; and (2) the retaliation was motivated, at least in part, by his engaging in that protected conduct. *Hutchins*, 253 F.3d at 186 (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).

Action taken in furtherance of an FCA action is protected conduct.  *Id.* at 186.  The employee need not file a *qui tam* action before he is terminated.  *Id.* at 188.  It is enough that he was conducting an investigation that was "calculated, or reasonably could lead to" an FCA claim.  *Id.* at 187.

The employer knows the employee was engaged in protected conduct when it was "on notice of the 'distinct possibility' of FCA litigation."  *Id.* at 188.  The test is:

> whether the employee engaged in conduct from which a fact
> finder could reasonably conclude that the employer could
> have feared that the employee was contemplating filing a qui-
> tam action against it or reporting the employer to the
> government for fraud. . . . [L]itigation . . . [is] a "distinct
> possibility" only if the evidence reasonably supports such fear;
> if the evidence does not support this fear, litigation would not
> have been a distinct possibility.

*Id.* (internal citation omitted).

As alleged, Carson repeatedly complained to his supervisors about "improper billing practices,"[161] including Medicare and Medicaid billing. Those complaints constitute protected conduct and put Select on notice that he was possibly investigating a potential FCA claim or contemplating reporting fraud. After he complained, Select terminated his employment.

Select argues that Carson's allegation that he "spoke out against the improper conduct to his supervisors"[162] is insufficient because he does not identify what he said and when. It adds that Carson did not link his complaints to any *qui tam* action it could have anticipated.

Accepting Carson's allegations as true, he acted in furtherance of a potential FCA action. He alleges that he complained to his supervisors about fraudulent practices. His complaints were directly related to improper billing practices in the context of Medicare and Medicaid. One could reasonably infer that Select interpreted his complaints about improper billing practices as building an FCA case. Select would have been concerned that Carson was conducting or considering conducting an investigation into a possible false claim and terminated his employment before he could further investigate.

Select argues that complaining to supervisors is not enough. It contends he needed to complain to upper management or Select's legal counsel. We disagree.

Communicating his concerns to supervisors is enough.  It is reasonable to infer that his supervisors passed his concerns up the management ladder.

In sum, Carson repeatedly complained to his supervisors about improper billing. Those complaints constitute protected conduct and put Select on notice that he was investigating a potential FCA claim.  In response, so he alleges, Select terminated his employment.  At this stage, these allegations are enough to show that Select retaliated against him.

Although Carson does not specify which defendants he asserts this count against, his allegations regarding retaliation relate only to Select.  Carson alleges that he "was employed by Select Rehab from October 28, 2011 through March 2015 as a physical therapist assistant."[163]  The count is titled "Select Rehabilitation's Unlawful Retaliation."[164] Therefore, we shall dismiss Count VIII against Care Pavilion, Mid-Atlantic, Wesley Rehab and Wesley.

<u>Counts IX-XXIII – State Law Claims</u>

Carson alleged that defendants violated 15 state false claims laws.  The states are Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Maryland, Massachusetts, New Jersey, New York, North Carolina, Rhode Island, Texas, Virginia, and Washington.  His allegations regarding these states are insufficient to satisfy the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b).

Defendants argue that the state law claims should be dismissed under Rules 8(a) and 9(b) for the same reasons that the FCA claims should be dismissed.  Defendants add that the Complaint does not allege that the fraudulent conduct occurred in any state other than Pennsylvania.   They also claim that Carson fails to plead how Medicaid

reimbursement works under each state's laws and how false claims would have been submitted in any state other than Pennsylvania.  They are correct.

Carson worked solely at Pennsylvania SNFs.  The factual allegations in the Complaint describe fraud at those facilities.  Based on his nonspecific bald allegations of a potential nationwide scheme, Carson asserts false claims actions under 15 states' laws. He relies on the alleged reports of an unnamed "individual [who] knew that these improper treatments were done on a *nation-wide basis* because of where he had worked."[165]

An individual relating that employees "across the country"[166] complained about improperly treating patients is insufficient to show that defendants submitted false or fraudulent claims in fifteen different states.  The same is true of Carson's allegation that the same individual knew that improper treatment was performed "on a nation-wide basis."  There are no allegations of any improper therapies or fraudulent billing in any state other than Pennsylvania.  Because there is no factual basis for asserting state law claims, we shall dismiss Counts IX through XXIII of the Complaint.

### Leave to Amend

Where the complaint does not withstand a 12(b)(6) motion, a curative amendment must be allowed unless amendment would be inequitable or futile.  *Alston v. Parker*, 363 F.3d 229, 235 (3d. Cir. 2004) (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)); *see also Estate of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 861 (3d Cir. 2014) (quoting *Phillips*, 515 F.3d at 245).  An amendment is futile if the proposed amendment would still fail to state a claim upon which relief can be granted. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (quoting *In re Burlington Coat Factory,* 114 F.3d at 1434).

We shall deny Carson's request to amend Counts IV through VII and IX through XXIII.  He cannot cure the deficiencies.  We shall allow him to amend his complaint to cure the deficiencies in Counts I and II against Care Pavilion, Mid-Atlantic, Wesley Rehab, Wesley, and Marwood, and Count III against all remaining defendants.

---

[1] There are five defendants left—Select, Care Pavilion, Mid-Atlantic, Wesley Rehab, and Wesley. Saunders House was dismissed pursuant to the terms of a Settlement Agreement.  Joint Stipulation & Written Consent of Dismissal (Aug. 8, 2022), ECF No. 44.  Carson voluntarily dismissed Bryn Mawr Terrace and Main Line Senior Care Alliance with the Government's consent without prejudice.  *Id.*  Although Marwood has been served, no attorney has entered an appearance on Marwood's behalf.

[2] Those states are Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Maryland, Massachusetts, New Jersey, New York, North Carolina, Rhode Island, Texas, Virginia, and Washington. Compl., Counts IX–XXIII, ECF No. 1.

[3] The Gov't's Notice of Election to Intervene in Part for Purposes of Settlement & to Decline to Intervene in Part (July 5, 2022), ECF No. 40.

[4] *Id.*

[5] The court may dismiss claims as to non-moving defendants if the claims against the non-moving defendants suffer from the same defects raised in the moving defendants' motions.  *Minn. Lawyers Mut. Ins. Co. v. Ahrens*, 432 F. App'x 143, 148 (3d Cir. 2011) (quoting *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir. 1980) (stating that the court may sua sponte dismiss a claim as to non-moving defendants where the inadequacy of the claim is clear)).  A claim against a non-moving party may be dismissed if the claims against all defendants are "integrally related" or where the non-moving defendants are in the same position as the moving defendants.  *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993) (citations omitted).  Therefore, we shall apply our analysis of the motions to dismiss to Marwood Rest Home, Inc. to the extent the deficiencies cited in the motions apply to it.

[6] Compl. ¶ 41.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.* ¶ 42.

[11] *Id.*

[12] *Id.* ¶ 43.

[13] *Id.*

[14] *Id.*

[15] Dep't of Health & Hum. Servs. Off. of Inspector Gen., Inappropriate Payments to Skilled Nursing Facilities Cost Medicare More than a Billion Dollars in 2009 at 3 (Nov. 2012) (attached as Ex. A to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-2) ["Nov. 2012 OIG Study"]; Compl. ¶ 44.

[16] Nov. 2012 OIG Study at 3; Compl. ¶ 44.

[17] Nov. 2012 OIG Study at 3.

[18] *Id.*

[19] Nov. 2012 OIG Study at 3; Compl. ¶ 44.

[20] Nov. 2012 OIG Study at 3; Compl. ¶ 45.

[21] Nov. 2012 OIG Study at 3; Compl. ¶ 44.

[22] Nov. 2012 OIG Study at 4; Compl. ¶ 45.

[23] Compl. ¶ 45

[24] *Id.* ¶¶ 13–22.

[25] *Id.* ¶ 14.

[26] *Id.*

[27] *Id.* ¶ 18.

[28] *Id.* ¶ 20.

[29] *Id.* ¶ 18.

[30] *Id.*

[31] *Id.* ¶ 20.

[32] *Id.*

[33] *Id.* ¶ 24.

[34] *Id.*

[35] *Id.* ¶¶ 13–22.

[36] *Id.* ¶¶ 4–7.

[37] Transcript of Oral Argument at 29:3–6, 13–15; 46:8–10; 49:18–22; 52:20–21 (Jul. 11, 2023).

[38] Compl. ¶ 59.

[39] *Id.* ¶ 83.

[40] *Id.* ¶ 80.

[41] *Id.* ¶ 93.

[42] *Id.* ¶ 80.

[43] *Id.*

[44] *Id.* ¶ 131.

[45] *Id.* ¶¶ 131–35.

[46] *Id.* ¶¶ 131–35.

[47] *Id.* ¶ 137.

[48] *Id.* ¶ 138.

[49] *Id.* ¶¶ 73, 100.

[50] *Id.* ¶ 74.

[51] *Id.* ¶ 76.

[52] *Id.* ¶ 99.

[53] *Id.* (emphasis in original).

54 *Id.* ¶ 140.

55 *Id.*

56 *Id.*

57 *Id.* ¶ 99.

58 *Id.* ¶ 68.

59 *Id.*

60 *Id.* ¶ 70.

61 *Id.* ¶ 75.

62 Transcript of Oral Argument at 29:3–6, 13–15; 46:8–10; 49:18–22; 52:20–21 (Jul. 11, 2023).

63 Compl. ¶ 144.

64 *Id.*

65 *Id.*

66 *Id.* ¶ 145.

67 *Id.*

68 *Id.* ¶ 142–43.

69 Mid-Atlantic and Care Pavilion adopt Select's public disclosure argument.  Reply in Supp. of Defs. Mid-Atlantic Healthcare, LLC & Care Pavilion Nursing & Rehabilitation Center's Mot. to Dismiss at 10 n.9, ECF No. 92.  The Wesley defendants do not address it.

70 Decl. of William L. Hurlock in Supp. of Relator Carson's Opp'n to Defs.' Mot. to Dismiss ¶¶ 3–4, ECF Nos. 88-1, 89-1, & 90-1.

71 Carson only responded to the Wall Street Journal article in his response.  The other studies and reports were attached to Select's reply to Carson's response.  Carson did not file a sur-response brief.

72 Dep't of Health & Hum. Servs. Off. of Inspector Gen., Questionable Billing by Skilled Nursing Homes (Dec. 2010) (attached as Ex. D to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-5) ["Dec. 2010 OIG Report"].

73 Nov. 2012 OIG Study.

74 Dec. 2010 OIG Report at i.

75 *Id.*

76 *Id.* at ii.

77 *Id.*

78 *Id.*

79 *Id.*

80 *Id.*

81 *Id.*

82 *Id.*

83 *Id.*

84 *Id.*

85 *Id.* at iii.

86 *Id.*

[87] *Id.*

[88] *Id.* at iv.

[89] Nov. 2012 OIG Study at i.

[90] *Id.*

[91] *Id.*

[92] According to the article, "CMS monitors the accuracy of payments made to providers through the Comprehensive Error Rate Testing (CERT) program. The CERT contractor reviews a sample of claims to determine an error rate. CMS defines the error rate as the percentage of total dollars that Medicare erroneously paid or denied." *Id.* at 5.

[93] *Id.* at i.

[94] *Id.*

[95] Dept' of Health & Hum. Servs. Off. of Inspector General., Early Alert Mem. Report Changes in Skilled Nursing Facilities Billing in Fiscal Year 2011, OEI-02-09-00204 (attached as Ex. B to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-3)

[96] *Id.* at 1.

[97] *Id.*

[98] *Id.* at 2.

[99] Dep't of Health & Hum. Sevs. Off. of Inspector Gen., Semiannual Rep. to Congress (Oct. 1, 2010–Mar. 31, 2011) (attached as Ex. C to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-4).

[100] *Id.* at iii.

[101] *Id.* at iv.

[102] Christopher Weaver, Anna Wilde Mathews, & Tom McGinty, *How Medicare Rewards Copious Nursing Home Therapy*, Wall S. J., Aug. 16, 2015 (attached as Ex. A to Def. Select Rehabilitation, LLC's Mot. to Dismiss, ECF No. 76-2).

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] Lisa M. Noller & Lori A. Rubin, *DOJ Pursuing Therapy Providers Under the FCA*, Health Care Law Today, May 18, 2015 (attached as Ex. E to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-6)

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

---

[116] Terry Baynes, *Government report finds care lapses at nursing facilities*, Reuters Legal, Mar. 4, 2013 (attached as Ex. F to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-7).

[117] *Id.*

[118] Sheila W. Sawyer & Richard W. Westling, *New OIG Report Cites $1.5 Billion in Inappropriate Medicare Payments to Skilled Nursing Facilities*, Martindale, Nov. 21, 2012 (attached as Ex. G to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-8).

[119] *Id.*

[120] *Id.*

[121] Thomas Burton, *Nursing Homes Said to Overbill U.S.*, Wall St. J., Nov. 13, 2012 (attached as Ex. H to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-9).

[122] *Id.*

[123] *Id.*

[124] Kenneth L. Burgess, *CMS's Recovery Audit Contractors Appear Poised to Audit Facilities With Ultra High Therapy RUGs*, The Nat'l L. Rev., Jan. 2012 (attached as Ex. I to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-10).

[125] *Id.*

[126] *Id.*

[127] Paul Barr, *SNF billing questioned – HHS report draws ire from industry members*, 41 Mod. Healthcare 1, Jan. 7, 2011 (attached as Ex. J to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-11).

[128] *Id.*

[129] *Id.*

[130] Diana Manos, *OIG wants to crack down on nursing home RUG billing*, Dec. 30, 2010 (attached as Ex. K to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-12).

[131] *Id.*

[132] RACmonitor, *Questionable Skilled Nursing Billings Could Top $500 Million*, RACmonitor, Dec. 28, 2010 (attached as Ex. L to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-13).

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] Scott Higham & Dan Keating, *Review heightens concerns over Medicare billing at nursing homes*, Wash. Post, Mar. 29, 2010, at A03 (attached as Ex. M to Select Rehabilitation's Reply Mem. In Supp. of Mot. to Dismiss, ECF No. 93-17).

[139] Nov. 2012 OIG Report at i.

[140] *Id.* at 1.

[141] Relator Patrick Gerard Carson's Opp'n to Def. Select Rehabilitation's Mot. to Dismiss at 23, ECF No. 90 ["Opp'n to Select Mot. to Dismiss"] (quoting *Omnicare*, 903 F.3d at 89–90).

[142] *Id.*

143 The reports included: (1) a 1999 advisory opinion by the Health and Human Services – Office of the Inspector General; (2) a 2000 Health and Human Services – Office of the Inspector General's "Compliance Program Guidance for Nursing Facilities"; (3) a 2008 Health and Human Services – Office of the Inspector General's "Supplemental Compliance Program Guidance for Nursing Facilities"; (4) a 2004 report by the Lewin Group commissioned by the Centers for Medicare and Medicaid Services; (5) 2007 reports by the Harvard Medical School and the Medicare Payment Advisory Commission; and (6) PharMerica's Form 10-k financial disclosure. *Omnicare, Inc.*, 903 F.3d at 81.

144 Saunders House was dismissed pursuant to the terms of a Settlement Agreement.  Carson voluntarily dismissed Bryn Mawr Terrace with the Government's consent without prejudice.

145 Compl. ¶ 75.

146 *Id.* ¶ 59.

147 *Id.* ¶ 83.

148 *Id.* ¶ 80.

149 *Id.* ¶ 93.

150 Transcript of Oral Argument at 20:23–24.

151 Relator Patrick Gerard Carson's Opp'n to Defs. Wesley Enhanced Living Main Line Rehabilitation & Skilled Nursing & Wesley Enhanced Living's Mot. to Dismiss at 3, ECF No. 88 ["Opp'n to Wesley Mot. to Dismiss"]; Relator Patrick Gerard Carson's Opp'n to Defs. Mid-Atlantic Healthcare, LLC & Care Pavilion Nursing Home & Rehabilitation Center Mot. to Dismiss at 2–3, ECF No. 89 [Opp'n to Mid-Atlantic Mot. to Dismiss"]; Opp'n to Select Mot. to Dismiss at 2.

152 Transcript of Oral Argument at 30:9–11.

153 *Id.* at 33:20–22.

154 *Id.* at 20:22–24.

155 *Id.* at 19:8.

156 Compl. ¶ 158.

157 *Id.* ¶ 159.

158 Opp'n to Select Mot. to Dismiss at 21.

159 Opp'n to Select Mot. to Dismiss at 27; Opp'n to Mid-Atlantic Mot. to Dismiss at 18; Opp'n to Wesley Mot. to Dismiss at 15.

160 Opp'n to Select Mot. to Dismiss at 27.

161 Compl. ¶ 144.

162 *Id.* ¶ 145.

163 *Id.* ¶ 24.

164 *Id.* at 35.

165 *Id.* ¶ 119 (emphasis added).

166 *Id.* ¶ 118.